Argued January 8, affirmed February 26, 1929.

IN THE MATTER OF THE ESTATE OF E. E. FISHER, DECEASED.

HAROLD L. COOK *v.* UNITED STATES NATIONAL BANK, EXECUTOR.

(274 Pac. 1098.)

For appellant there was a brief and oral arguments by *Mr. William P. Ellis* and *Mr. Harold L. Cook, in pro. per.*

For respondent there was a brief over the names of *Messrs. Keyes & Page* and *Mr. Lars R. Bergsvik*, with an oral argument by *Mr. E. Max Page*.

McBRIDE, J.—1. In order to recover in this proceeding claimant must show by satisfactory and convincing evidence, first, that at the time of the death of Dr. Fisher, claimant had a complete subsisting contract with deceased; second, that he and his cobeneficiary had complied with all the stipulations therein prescribed by the contract to be performed by them; third, that deceased breached the contract; and fourth, that damage resulted from such breach. All these facts must be evidenced by some corroborating evidence other than that of the claimant.

Outside of the fact that there was an exchange of properties substantially in line with that specified in the alleged agreement, and a mortgage given by claimant and his sister for $9,000 and interest, the whole matter rests upon the unsupported and uncorroborated testimony of claimant. Whether claimant or his sister received the whole or any part of the $9,000, or whether the failure of Dr. Fisher to comply with the agreement was the cause of their giving up the property, or what the real inside facts in regard to this transaction actually are, rest solely upon claimant's uncorroborated testimony, when it is apparent that other testimony, if it existed, was within his reach.

2. The alleged contract between Dr. Fisher and claimant is ambiguous in some particulars and not in itself a complete contract. It provided that claimant and his sister should purchase the property for $14,000, but was not signed by Miss Cook. It pro-

vided for a two-thirds interest in the property purchased to be conveyed to her and one third to claimant. Manifestly incomplete at the time, the whole matter was up in the air until Miss Cook had accepted the terms and made herself a party to the contract. The agreement was not severable into two contracts, but joint. If claimant turned in his property on the deal and if Miss Cook accepted the terms and purchased the property, then, if such consideration was sufficient, there was a joint contract, not joint and several, to pay the Cooks $9,000 in installments of $1,000 a year. This was payable to the Cooks, not to the Lamports. If claimant has any claim, he has only a joint claim with his sister for a breach: Parsons on Contracts (7th ed.), 13; *Thieman* v. *Goodnight,* 17 Mo. App. 429; *Slaughter* v. *Davenport,* 151 Mo. 26 (51 S. W. 471).

3, 4. The consideration, so far as Miss Cook is concerned, is for past "faithful and helpful services." There is no indication that the past services here mentioned had not been paid for, or that they were such as created a moral obligation on the part of Dr. Fisher to pay for them so that the promise to pay $9,000 to her and her brother on account of them amounted to a gift and created no legal obligation, nor is she here claiming anything by reason of it.

If the same language were used in a will, it would support a bequest, because in that case no consideration is necessary to support a will; but to support an action on contract, the alleged consideration is insufficient, merely a promise to make a gift, and a promise to make a gift is never enforceable in law.

5, 6. Past services, when rendered under such circumstances as to create no legal liability, are not a

consideration for a subsequent promise: Page on Contracts, § 627 et seq. Then what is the consideration here? Upon claimant's theory, Dr. Fisher, who had no interest whatever in the property purchased and could derive no probable benefit from the purchase, agreed that if claimant and his sister would purchase it, and that if claimant should convey his equity in a contract for the purchase of certain other property as a net payment on the property to be purchased, and execute a mortgage on the property purchased for the balance of the purchase price, he would pay to them $9,000, which they, not Dr. Fisher, should apply on the purchase price. Claimant here is claiming in his own right. His sister paid nothing and has lost nothing by the transaction. His claim is in effect that Dr. Fisher agreed, that, if he, claimant, would make the exchange of properties and obligate himself and his sister to pay $9,000 difference, he, Dr. Fisher, would pay that difference.

There is no promise on the part of the claimant or his sister to repay this $9,000 and interest on deferred payments. In the language of the street, we might inquire, "where does Dr. Fisher get off" on this financial excursion? He is not to be repaid and is not interested in either tract of land. His only compensation is the altruistic one of being able to see his friends make a good trade. Were not the identity of this alleged contract admitted by defendant's counsel on the trial, we would be inclined to doubt its genuineness, but it is admitted. But there is no getting away from the fact that the promise was gratuitous and probably a part of some larger or different transaction not disclosed in the testimony. There are too many unexplained circumstances in connection with

this affair, and too many inherent improbabilities in claimant's account of the matter to justify us in allowing this claim.

The first improbable part of the narrative is claimant's account of the anxiety of Dr. Fisher that claimant and his sister should make this trade and whereby he would gain only the privilege of presenting them with $9,000, and several thousand dollars more in accrued interest without a nickel's advantage to himself. Claimant says, ''he was very anxious to enter into the agreement * * I liken him to a young boy going to his first circus, he was so anxious to enter into this proposition, and finally I entered into an agreement with him.'' All of which, while seeming the very height of romantic altruism ill comports with the character of a man whose business methods had enabled him to accumulate a competence of $130,000, and who had a family to protect and provide for. Such a man might in a moment of friendship consent on solicitation to assume a friend's debt for several thousand dollars, but that he would enthusiastically insist on the privilege is not so probable. Another improbability is that the agreement was dictated by Dr. Fisher. The document is carefully drawn and contains every technical legal requirement so far as such existed to make it a perfect document. It exhibits the characteristics of having been prepared, not by a physician or a layman, but someone possessing at least the elementary requisites of a legal education. That the deceased signed it, is unquestioned, but the statement that he dictated it is subject to serious doubt. We do not assert that it is impossible that claimant's account of the transaction is true, or that the legal effect of the transaction would have been dif-

ferent had he been corroborated in the statement made by him; but looking at it from the standpoint of an observer who knows practically nothing of the parties, these apparent improbabilities lend an air of doubt and uncertainty to the transaction, which would cause an unprejudiced person to hesitate in deciding what is in effect an action for unliquidated damages against the estate, and which attempts to establish the fact that a large liability has been incurred by one whose lips are sealed in death.

There are too many missing chapters in the history of the transaction. Claimant's sister, as it appears by the contract, was largely a beneficiary of its provisions. As it appears by a letter of claimant, she was a probable beneficiary to the extent of two thirds of the property to be purchased and $9,000 of the purchase price, and she of all persons on earth was the one who could have thrown light on the ins and outs of this transaction. As such beneficiary, she would, unless there were some unrelated circumstances connected with the transaction, have had the right of action against Dr. Fisher. And yet, she does not appear as a claimant and is not even called as a witness. Mr. and Mrs. Lamport, who were parties to the exchange of property with the Cooks and the holders of the mortgage for $9,000, and who, so far as appears here, are disinterested as to the result of the action, could no doubt have given testimony as to Dr. Fisher's activities in the deal, but they were not called.

Another circumstance that throws a shade of doubt and mystery upon the claimant's claim is a letter, which was introduced in evidence by defendant and which was elicited under the circumstances detailed

in the letter to the executor bank. This letter explains itself and is as follows:

"February 10, 1927.

"Karl E. Wenger, Assistant Cashier,
  "United States National Bank,
    "Salem, Oregon.

"Dear Sir:

"This will acknowledge receipt of your letter of January 24th, regarding my note in favor of Ladd & Bush Bank, in the sum of $700, which became due January 1, 1927.

"I have called at the United States National Bank on three occasions to see you personally about this matter, and having failed in that mission take this opportunity to write this letter.

"Some time ago Dr. Fisher urged my sister and I to invest in a piece of real estate on the Garden Road, to the extent of $14,000. He agreed with my sister that if I would trade in the home I then owned as a part of the purchase price, that he would pay her an extra $1,000 per year, as a part of her salary, to be applied on the purchase price of the property. A contract protecting my interest in the property has been lost. The deal was made as agreed, but before Dr. Fisher or my sister made any payment whatsoever on the purchase price of the property they severed business relations. The property was divided, part sold and part turned back to the mortgagee.

"The deal meant a loss to me of several years' savings, represented by the home that I owned and traded in as the initial payment on the purchase price of the Garden Road property.

"Dr. Fisher, appreciating the loss to me, has aided me by being surety on my note at Ladd & Bush Bank from that time, and no doubt would have remained as such until I could have recovered a financial standing.

"From the time the note was first signed, it has been reduced several hundred dollars, though but slowly.

"I am not now in a position to pay the note, and Ladd & Bush will not renew the same without sufficient security. This I do not have.

"I request, therefore, that this note be paid from Dr. Fisher's estate, and that I be permitted to repay the same to the estate as time goes on in small monthly payments.

"This is absolutely the best proposition I have to make regarding the matter, and trust that you will either find it convenient to take up the note as suggested, or propose a method as convenient for handling the same.

"I shall await your further advice.

"Yours very truly,
"HAROLD L. COOK."

It is significant that if Dr. Fisher actually owed claimant $5,000, or if it had then been in claimant's mind that he had a valid claim for that amount he should have omitted to mention it. Instead of this, he practically asks the executor of Dr. Fisher's estate to pay the note mentioned in the letter and allow him to repay the estate in installments. There is no intimation that Dr. Fisher had broken his contract, but simply that Miss Cook and Dr. Fisher severed business relations before the time of payment arrived.

The claimant's testimony shows him to be a young man of much more than ordinary intelligence, fully capable of realizing his rights and enforcing them, and, yet, he does not even ask that the estate pay the note for $700 and release him, but only that he may be permitted to repay the estate in installments.

7. The letter is inconsistent with the claim now made by claimant and was properly admitted. Another circumstance, which militates against claimant's present position is the fact of his delay in prosecuting his claim. The agreement upon which claimant bases

his claim is dated the tenth day of March, 1923. The first payment on the mortgage executed by claimant and his sister came due on March 10, 1924, and, as alleged by claimant, Dr. Fisher refused to pay the $1,000 and interest then due, and refused thereafter at all times to make any payments whatever. In fact, it is claimed in the brief that in the month of November, 1923, Dr. Fisher notified the claimant that he would refuse to be bound by the contract, so that it is settled that from March 10, 1924, up to the day of his death on October 21, 1926, claimant knew that Dr. Fisher declined to make any payments toward the purchase of the property. Not invoking the doctrine of laches, which technically is only an equitable defense, we may well ask why, if claimant really recognized the contract as then in existence, he did not bring his action then. Dr. Fisher was abundantly able to respond in damages, was a resident of the same city with claimant and his alleged repudiation of the contract, if he did repudiate it, could more easily have been proved then than four years later.

8. But instead of insisting on his alleged right, he continued, as he claims, on friendly terms with Dr. Fisher, procured him to act as surety on a note given to Ladd & Bush, and after his death requested the executor of Dr. Fisher's estate to pay the note and give him leave to repay the estate on installments. After Dr. Fisher's death, he did not promptly present his claim for damages, but remained quiescent for another year, and at the last moment, in January, 1928, just as the estate was about to be closed, he presented his claim. His excuses for this delay are unsupported by any testimony except his own and do not appear to be cogent or even reasonable. In fact,

outside of the testimony of claimant, there is no testimony as to a breach by Dr. Fisher, or a circumstance of the alleged breach. Although it may be fact that Dr. Fisher did not pay to claimant or his sister the $9,000 mentioned in the agreement, declarations made by him to his wife and Miss Steele indicate indefinitely that in his judgment he had paid the Cooks all that he considered them entitled to. While not entitled to great weight, these declarations were admissible under Section 732, Or. L., and are quite as valuable as the uncorroborated testimony of claimant.

9. The claimant presents here merely the agreement between himself and Dr. Fisher, which does not contemplate that Dr. Fisher should make himself personally liable to the Lamports for a single dollar, but only to pay to Miss Cook, or herself and brother, $1,000 a year and interest at 6 per cent for nine years, which she and her brother were to apply in payment of the property. The contract as signed was incomplete to say the least. Miss Cook did not bind herself to purchase the property, or to accept the $9,000 and apply it on the purchase price so that she was not a party to the transaction at the time the inchoate agreement was signed. If she ever became a party to it, it resulted from her accepting a deed to two thirds of the property and joining in a mortgage to secure its payment and such joining in the mortgage created no further liability beyond having what was so conveyed taken away from her by a possible foreclosure and, in that contingency, she would be neither richer nor poorer by the transaction. We have no testimony that the agreement between her brother and Dr. Fisher was the cause of her signing the mortgage,

or whether she even accepted the proposed benefaction, or even intended to apply the money to the payment of the consideration for the Lamport deed. She is not here either as a plaintiff, a claimant, or a witness, and, therefore, the presumption is that she is entirely satisfied with the results of the transaction.

10. There are some technical objections to the findings, but if we reject those which seem to go rather to the court's idea of the law applicable to the case than to the supposed issues in the case, there still remains enough to support the judgment. This was a summary proceeding without formal pleadings, and in such inquiries, any evidence, which would have been admissible under any form of pleading, is admissible; and any defense, which could have been pleaded in an ordinary law action, will be considered as though formally pleaded.

11. The claim has been presented to the executor and rejected. It has been presented, upon what is substantially an appeal, to the County Court and there examined and rejected. It was presented, on appeal, to the Circuit Court and there examined, tried, considered and rejected. The reason for this is apparent. The claim is accompanied with too many suspicious circumstances to convince the courts, that considered it, that it was genuine. There is a possibility that it is just, but the greater probability is that it is not. We have said, and all other courts have said, that the evidence in such cases should be strong and convincing, and we agree with the County Court and the Circuit Court in their conclusion that the evidence here possesses neither of these characteristics.

The case of *Van Slooten* v. *Wheeler, Executor,* 140 N. Y. 624 (35 N. E. 583) is very similar to this case

in many particulars. It is too long to be quoted, but is commended to the consideration of the profession, especially as the evidence for the complainant was much stronger than that adduced in the case at bar. The concluding paragraph of that opinion tersely states the policy of the courts in regard to this class of claims. It reads as follows:

"Public policy requires that claims against the estates of the dead should be established by very satisfactory evidence, and the courts should see to it that such estates are fairly protected against unfounded and rapacious raids."

This court by an unbroken line of decisions has announced the same doctrine: *Scott & Brown* v. *Merrill's Estate,* 74 Or. 568, 573 (146 Pac. 99); *Branch* v. *Lambert,* 103 Or. 435 (205 Pac. 995, 1002); *Wood* v. *Davin,* 122 Or. 74 (257 Pac. 690); *Estate of Griffith,* 119 Or. 87 (248 Pac. 156); *Bonnett* v. *Keiffer,* 115 Or. 244, 248 (237 Pac. 1); *Franklin* v. *Northrup,* 107 Or. 537 (215 Pac. 494).

The judgment of the Circuit Court is affirmed.

AFFIRMED.